IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 2005 Session

# STATE OF TENNESSEE v. ROBERT HOOD

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-05939-40     Joseph B. Dailey, Judge**

---

**No. W2004-01678-CCA-R3-DD  - Filed September 13, 2005**

---

Capital Defendant, Robert Hood, appeals as of right his conviction of first degree murder and sentence of death resulting from the  2001 murder of Toni Banks.  A Shelby County grand jury charged the defendant by indictment with one count of felony murder, one count of premeditated murder, two counts of misdemeanor theft of property, and two counts of especially aggravated kidnapping.  On May 6, 2004, a Shelby County jury found the defendant guilty of both counts of homicide and guilty as to both counts of misdemeanor theft.  The jury acquitted the defendant on both counts of aggravated kidnapping.  After a separate sentencing hearing, the jury unanimously found the presence of one statutory aggravating circumstance, that the defendant had previously been convicted of a violent felony offense.  The jury further determined that this aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt and imposed a sentence of death.  The trial court approved the sentencing verdict.  The defendant appeals presenting for our review the following issues: (1) whether the trial court erred by denying the defendant's request to proceed *pro se*, (2) whether the trial court erred by refusing to permit defense counsel to withdraw, (3) whether the presence of uniformed detention response team members sitting on either side of the defendant throughout trial was prejudicial error, (4) whether the evidence is sufficient to support a verdict of premeditated murder, (5) whether the trial court erred in admitting evidence involving prior bad acts of the defendant, (6) whether the trial court's instruction that the defendant's prior offenses were offenses whose statutory elements involved the use of violence violated the United States Constitution, (7) whether the death penalty imposed in this case violated due process because the indictment failed to allege the aggravators relied upon by the state, and (8) whether Tennessee's death penalty scheme is unconstitutional.  Finding no error requiring reversal, we affirm the defendant's conviction and sentence of death.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which, JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Robert Wilson Jones, District Public Defender; Diane Thackery, Assistant Public Defender; Latonya Burrows, Assistant Public Defender (at trial); Tony N. Brayton, Assistant Public Defender; Garland

Ergüden, Assistant Public Defender; and Phyllis Aluko, Assistant Public Defender (on appeal), for the appellant, Robert Hood.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Gerald Harris, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Guilt Phase Evidence*

On December 27, 2000, Phimphone Panyanouvong, his wife, and his daughter were at their home located at 3128 Ashwood in Memphis. Mr. Panyanouvong's wife, Thong, and his daughter, Phymonie, left the home to go to the grocery store. At the time, Mr. Panyanouvong was reading a book.

At approximately the same time, Joseph Jackson went to "the shop" to show his car to the man who had recently painted it. While Jackson was at the shop, he received a call on his cellular phone from the defendant. The defendant had two children with Jackson's sister, and the two men had business dealings together. The defendant asked Jackson to come pick him up and provided directions to a house near Camelot. The defendant advised Jackson that he would be in the doorway of the house. In the past, the defendant and Jackson had dealt with one another involving stolen property, and Jackson assumed that this call pertained to stolen property also. Jackson arrived at the location, parked his car, and went into the house. Jackson observed a "man laying [sic] on the floor gagging from blood coming out of his mouth." The defendant told Jackson that "he had to shoot him." Neither man did anything to assist the man lying on the floor.

While Jackson stood in shock, the defendant went through the residence gathering items. The defendant then proceeded to load his "loot" into a car sitting in the garage. Jackson observed "a bottle of whiskey, a [television] and a duffle bag." Jackson then observed the defendant drive off in the victim's car. Jackson followed in his vehicle. The defendant proceeded to a location off of Tchulahoma. He parked behind a building and waited for Jackson. The men then "loaded the stuff out [of] the victim's car into [Jackson's] car." The men then drove both vehicles to a side street off Winchester and parked the victim's car in front of a club. The defendant then joined Jackson in his vehicle, and Jackson drove the defendant to his apartment.

Thong and Phymonie Panuanouvong returned to their home a couple of hours later and noticed that the car was missing from the garage. At first, Thong thought her husband had gone to buy cigarettes. However, upon entering the house, she saw her husband "lay down in the front door." Thong called several family members and then called "911." Phymonie, Mr. Panyanouvong's daughter, noticed that her father was bleeding. Upon this discovery, Thong called the police. Before the police arrived, Thong walked through her house and observed that "[t]he house – the mess." Thong's and her husband's jewelry and a television were missing. Thong also

noticed that a clock, her fur coat, Mr. Panyanouvong's wallet, and a camcorder were missing.

At his apartment on Dunnavant Street that he shared with his girlfriend, the defendant unloaded the items from Jackson's car. Jackson noticed a duffle bag, a television, and a fur coat. Jackson never got out of his car, and when the defendant was finished unloading the car, Jackson left. The defendant paid Jackson not "even quite a hundred dollars" cash and gave him a camcorder. A few days later, the defendant also gave Jackson a credit card. Jackson purchased gas with the credit card.

Jackson was arrested on unrelated charges on January 8, 2001. While in jail, Jackson had his fiancé, Lisa Matthews, complete a three-way telephone call to the defendant on at least two occasions. During the telephone call, Jackson informed the defendant that he was not in jail because of the December 27 incident and that he would not inform the police about the December 27 incident. During these conversations, the defendant made a comment that his girlfriend, Toni Banks, knew too much and that "she got to go." The comment was prompted because Jackson heard yelling and screaming between the defendant and Banks. Jackson asked, "[W]hat's going on?" In response, the defendant kept saying "this girl," and then he made the comment that "she got to go."

The defendant lived with Toni Banks and her two children, James and Demarius, in an apartment on Dunnavant Street. The four had moved into the apartment around October or November of 2000. James was in the third grade, and Demarius was in the second grade. Percy Foster, Toni Banks's brother, lived in the apartment upstairs with his wife and three daughters. James Banks, another brother, also lived in the same apartment complex with his girlfriend and three children. It was well known that the defendant kept a gun tucked inside his waistband. Percy Foster had observed the defendant shooting a gun into the wooded area behind the apartment complex and had informed his mother that the defendant had a small caliber weapon in the apartment with Toni and her children.

On February 6, 2001, Toni Banks washed clothes at James's apartment after she returned from her job at Super Value. The defendant helped Toni bring over their dirty laundry to James's apartment. James noticed that the defendant had been drinking. That day, Toni had her rent money, $255 in cash, on her person. She also had additional cash, and she lent her brother Percy $20 at approximately 6:30 p.m. In addition, she gave her brother James money to buy liquor so James could make her daiquiris in his blender. Toni washed about ten loads of laundry at James's apartment. James later went to Toni's apartment to tell her that she had left some of her laundry at his apartment. Toni and the defendant then had words about the laundry because the defendant refused to go get the laundry. James commented that the defendant was living free on her paycheck and that he could not even assist her with the laundry. Toni told James not to worry about it and gave him money to go buy a beer. She added that she was going to get rid of the defendant and that he was going to have to leave her house.

The defendant and Donald Armstrong went to the liquor store at about 8:45 p.m. and bought a half pint of E & J Brandy. Armstrong noticed that, although the defendant did not act

drunk, he did look as if he had been drinking. During their trip to the liquor store, the defendant related that he and his girlfriend had been having problems. When they got back to the apartment complex, the defendant remarked that he was "going to holler at his girlfriend and talk to her . . . [t]ry to . . . straighten things up with her." Forty-five minutes later, Armstrong saw the defendant again, and the defendant asked Armstrong to drive him somewhere. The defendant gave Armstrong five dollars for driving him to Crump Street. During the drive, the defendant told Armstrong that he had done something and that he was "fixing to leave town." Armstrong noticed that the defendant appeared "a little shook up and nervous." Armstrong dropped the defendant off on Crump Street across from the Martel Projects. As he was leaving, Armstrong observed the defendant run across the street to the projects.

Both Percy Foster and James Banks had seen the defendant standing in the driveway drinking with their younger brother, Leslie. James went out and had a "couple of drinks with Leslie." The defendant later came to Foster's apartment, which surprised Foster because the two men did not get along. The defendant was returning three knives that Toni had borrowed from her brother. The defendant told Foster that "he didn't want any confusion down at the house that night. And he was taking – for me not to bring anything sharp back down to the house. And if anything go on downstairs – you know, he knew that I could hear through the heater – that if I heard anything going on for me to please come down there. He would open the door for me. . . . He promised me that." Neither Percy Foster nor his wife could make any sense of the defendant's comments. Foster saw the defendant again at 8:30 p.m. when a friend alerted him that the defendant and Foster's brother, Leslie, were urinating on the garbage cans.

That evening, Toni prepared dinner for her children. The children observed Toni fighting with the defendant. During the fight, the defendant and Toni threw items at each other, and the kitchen table was knocked over. James later went upstairs to his uncle's apartment and telephoned his grandmother, telling her that he wanted to go to her house. He then returned to his own apartment. Eventually, Toni told her children to go their bedroom, and the couple continued arguing.

On February 7, 2001, James woke up late for school. He woke his brother, and the two went to find their mother. The two boys thought she was in her bedroom, but she did not respond to their calling her. Her bedroom door was locked, so James "got a knife and opened the door." Upon opening the door, James saw a form on the bed covered with bedclothes. Frightened by their finding, the boys attempted to leave the apartment. The defendant was not in the apartment.

The boys discovered that they were locked inside the apartment and only their mother and the defendant had keys to unlock the door. James then took a broom and knocked on the ceiling to signal their cousin, who lived upstairs, to come down. Shortly thereafter, a cousin, Lashelle Foster, came downstairs. However, she was unable to gain access to the locked apartment. Lashelle instructed the children to take the covers off of the body in their mother's bedroom. The boys did as instructed and discovered their mother beneath the covers. They were unsuccessful in their attempt to awaken her. The boys noticed that their mother was not breathing and that there was

blood on her head. Lashelle informed her father, who was upstairs in his apartment, that Toni had been shot. Percy Foster then called 911. The police and an ambulance arrived. The police, assisted by Percy Foster and his friends, broke the lock on the front door to gain access to the apartment.

Lashelle Foster took the children upstairs to Percy's apartment while Percy Foster proceeded to the victim's bedroom. Percy observed his sister "laying [sic] there with a bullet hole in her head, blood against the wall, partly covered body." The house was ransacked, which was unusual because Toni "kept a very neat house." No money was found in the apartment.

Memphis Police Officer Cham Payne responded to the call at the Dunnavant Street apartment. He arrived after the uniformed officers had secured the scene. At this time, the only suspect was the defendant. No weapon, keys, or money was found at the scene. The only place where blood was found was the east wall of the bedroom near the victim's head. The victim was dressed only in a purple T-shirt. A pair of children's scissors was found beneath some clothes on the mattress. A bullet was later recovered from the victim's body. Lieutenant Venus Owens, also at the crime scene, observed that the victim's body was "crammed against the wall, appeared to have been pushed like into a corner, and her head was jammed against the wall."

Memphis police officers attempted to locate the defendant. They were later advised by the defendant's family members that he was no longer in Memphis and that they did not know where he was. Notwithstanding, during the May 2001 term, the Shelby County grand jury indicted the defendant on one count of felony murder resulting in the death of Toni Banks, one count of premeditated first degree murder resulting in the death of the victim, two counts of especially aggravated kidnapping, one count of theft of property by obtaining the victim's property, and one count of theft of property by exercising control over the victim's property. In June 2001, Memphis police officers learned that the defendant was in custody in Colorado. In February 2003, Captain Ronald Goodwin, a member of the District Attorney's Anti-Gang Team, accompanied by his partner Ronny Wilkerson, drove to Colorado and took the defendant into custody.

Heath Barker, a special agent forensic scientist with the Tennessee Bureau of Investigation, examined the bullet and lead fragments from both the Panyanouvong murder and Toni Banks's murder. Special Agent Barker examined the specimens in an attempt to determine whether both bullets were fired from the same weapon but could not reach a conclusion because the bullets and fragments were too mutilated for testing. However, Special Agent Barker was able to conclude that both bullets were fired from a .22 caliber weapon. The sound emanating from the firing of a .22 caliber weapon is not as loud as that from a larger caliber weapon.

Doctor Cynthia Gardner, a Deputy Medical Examiner for Shelby County,[1] performed the autopsies on the bodies of Toni Banks and Mr. Panyanouvong. Regarding the autopsy of Toni Banks, Dr. Gardner found that the toxicology testing indicated the presence of both caffeine and alcohol in the victim's blood. The victim's blood alcohol level was .23 grams per decimeter. A physical examination of the victim's body revealed the presence of a near contact gunshot wound

---

[1] At the time of trial, Dr. Gardner was employed as a deputy coroner in Hamilton County, Ohio.

above the right eye on the right forehead. In support of the conclusion that the gunshot was near contact, Dr. Gardner found gunpowder stippling as well as unburned flakes of gunpowder and soot. This fine residue is only visible when the gun is fired from six inches or less from the victim's body, supporting the conclusion that the weapon was fired within six inches from the head. Doctor Gardner also found unburned flakes of gunpowder on the inside of the victim's right arm. The presence of the flakes on the victim's arm in relation to the gunshot wound are consistent with a defensive type maneuver and are also consistent with the "way one's arm might be laying if they were . . . asleep." Doctor Gardner removed a bullet from the victim's brain.

Doctor Gardner also observed the blood patterns. From the pattern of the blood emanating from the wound, Dr. Gardner was able to determine that the pattern was consistent with the victim lying down at the time the wound was inflicted. Doctor Gardner concluded that the victim's death was caused by a gunshot wound to her head. She further concluded that the gun was fired within six inches from her head.

Following the proof, the trial court instructed the jury as to the applicable law. The jury began deliberations at 8:00 p.m. The trial court ended deliberations at 9:30 p.m. and resumed deliberations the next day at 8:45 a.m. The jury returned their verdict at 10:20 a.m. The jury found the defendant guilty of first degree felony murder, first degree premeditated murder, and theft of property. However, the jury acquitted the defendant of both counts of especially aggravated kidnapping.

### *Penalty Phase Evidence*

At the penalty phase, the state introduced the testimony of Barbara Banks, the victim's mother. Ms. Banks testified that she had seven children. She stated that since her daughter's murder she has custody of Toni's children, 12-year-old James, 10-year-old Demarius, and 16-year-old Lisa. Ms. Banks explained that the children lived with her and her husband, along with Barbara Banks's daughter, whose name is also Lisa, and her baby. She testified that neither she nor her husband works and that they survive on social security alone. She added that she is 64 years old and her husband is 76 years old. Her daughter Lisa works, and James, Demarius, and Lisa each receive $124.00 a month in social security death benefits.

Barbara Banks testified that she takes medication for nerves, high blood pressure, and her heart. She explained that she began taking the medication soon after her daughter's murder. She stated that it is a burden to "start all over raising small kids."

Ms. Banks further testified that, at the time of the murder, the victim was thirty-five years old. Toni was working, going to church, and was generally doing well at the time of her death. Since her murder, the victim's children had suffered emotionally. Demarius, the youngest, has problems sleeping at night. James "acts out things . . . [h]e's very easy to get upset." The boys were attending counseling sessions, but Ms. Banks stopped taking them because she felt they were getting better. She realized that they were not better and was planning on resuming the counseling

sessions. Ms. Banks testified that Toni's oldest child, Lisa, helps her with the boys. Lisa has become withdrawn and has changed substantially since her mother's murder.

The state introduced through the testimony of Kimberly Tanzy, an employee in the Shelby County Criminal Court Clerk's Office, prior convictions of the defendant. The clerk's files indicated that the defendant had been indicted in case number 94-03958 for attempt to commit first degree murder but pleaded guilty to the lesser charge of reckless endangerment. Ms. Tanzy read into evidence the affidavit of complaint for this charge. The affidavit provided that

> Mr. Hubert Ballentine. . . rented the business establishment . . . at 1043 South Third for . . . a Christmas party . . . . Two subjects, [the defendant] and his brother, Billy Joe, entered the business and both men had been drinking. Both became loud and abusive towards the family and friends of Mr. Ballentine. . . . Mr. Ballentine told the two that they were not members of the family or of the business, and that . . . they would have to leave. He then physically escorted the two subjects out. The two subjects left . . . and returned . . . 10 minutes later. . . . [The defendant] produced a pistol and his brother . . . began fighting with . . . [the defendant], over who would get to shoot the victim. Defendant Billy Joe Hood . . . wrestled the gun from [the defendant] and then shot the victim, Hubert Ballentine. Mr. Ballentine was shot in the left side. The bullet went under his heart. He is listed in critical but stable condition.

Also introduced were instruments from Elpaso County, Colorado, showing that the defendant was convicted in case number 01-CR-2120 of one count of first degree kidnapping; five counts of committing a crime of violence using a deadly weapon; two counts of second degree kidnapping; one count of aggravated robbery; one count of aggravated criminal extortion; and one count of menacing. The defendant was also convicted in Colorado case number 01CR-2263 of two counts of murder in the first degree, four counts of committing a crime of violence with a deadly weapon, and two counts of aggravated robbery.[2] The defense stipulated that all of the convictions from Colorado and Tennessee belong to the defendant.

Officer Bernice Murckson, a deputy Shelby County jailer, testified for the defendant that she was assigned to the fourth floor, "B" pod, and had been for five months. She explained that "B" pod housed all high risk inmates. Officer Murckson stated that the defendant was housed in "B" pod. Officer Murckson testified that she had never had any problems with the defendant during her shift. She added that he interacted well with other inmates and that he followed the policy and procedures. She concluded that he was respectful of her.

---

[2]A motion filed by defense counsel averred that the defendant is currently serving a life sentence plus consecutive sentences totaling more than 500 years resulting from his Colorado convictions.

On cross-examination, Officer Murckson acknowledged that the defendant had violated jail rules on June 22, 2000, and June 23, 2000, while at "R" pod, for failing to comply with orders of a jailer. She stated that she was not assigned to that pod. She denied knowledge of other jail infractions committed by the defendant, including an occasion where he displayed his penis to an officer conducting an armband check, despite three prior verbal warnings to stop exposing himself. On another occasion, the defendant refused to "lock down" when ordered to do so by a jailer. As a result, the defendant was placed in administrative segregation. Officer Murckson explained that administrative segregation is for inmates who are out of control. She explained that her testimony was limited to the defendant's behavior only when he was under her supervision. She did not know that the defendant, while in custody in Colorado, had cut another inmate with a razor blade, resulting in a twelve-inch wound to the inmate's abdomen. She also was not aware of an incident in Colorado when the defendant created a jail disturbance and attempted to strike an officer.

Officer Donald Kelly, a deputy jailer, testified that he was assigned to fourth floor, "B" pod. He admitted that he was not aware of any of the infractions that Officer Murckson was questioned about by the state. Like Officer Murckson, he had only been on "B" pod for five months. During this time, Officer Kelly had not had any problems with the defendant. Officer Kelly testified that the defendant was "laid back" and stayed to himself.

Defendant's sister, Connie, testified that there were nine children in their family, six boys and three girls. Connie Hood noted that many of the defendant's family members were present in the courtroom, including his mother, his aunt, his sister-in-law, his children's mother, his son, another sister, and a brother.

Connie Hood stated that she was not close to her brother, Robert. She stated that prior to this trial, she had not seen her brother for five years. She explained that his absence from their family was his choice and that the family cared about him regardless of what he had done. Connie Hood stated that she had never visited her brother after he was taken into custody. She stated that she thought that "Cindy and my mom been down here." She did not know if any other family members had visited the defendant at the jail. She further testified that the defendant's actions during his adult life had affected their mother, knowing that she did not raise him that way. She acknowledged that another brother was in jail at the present time. The remaining siblings all work and have families.

Connie Hood testified that the defendant had received a gunshot wound to the head sometime during the 1990s. She did not know the circumstances of the shooting, but she did visit her brother while he was in the hospital. Connie Hood testified that the defendant has three children, ages 12, 17, and 19. She does not have contact with these children. She could not offer any explanation for the course the defendant chose to take. Rather, she stated that she would always wonder.

Their mother suffered from high blood pressure and is diabetic. Connie Hood stated

that her brother's receiving the death penalty would "really hurt [their mother] bad." She added that this would impact the entire family.

On cross-examination, Ms. Hood stated that she did not think that her brother's gun-shot wound to his head had any effect on him. She admitted that he was getting in trouble before the incident and continued to get into trouble after the incident.

Another sister, Cindy Hood, testified that the defendant was her younger brother. Cindy and her children had visited her brother in the jail and accepted collect calls from him. Cindy described her brother as "pretty decent as a human." She acknowledged that he had made "some mistakes," as "sure [as] we all have." She further admitted that he had "done some pretty bad things."

Cindy explained that her brother's behavior had greatly affected their mother. She stated that she had tried to convince her brother that there are other ways to do things but that he "made his own decisions." In stating that she did not believe that her brother should be sentenced to death, she admitted that he had "made some mistakes." She rationalized that "[w]e all have [made mistakes.] So should we all be sentenced to death?" She added that the imposition of a death sentence would be "devastating for me and my family as well as my kids." On cross-examination, Cindy Hood acknowledged that there is a difference between the mistakes made by the defendant and the mistakes made by herself. Cindy admitted that she had heard that her brother used the alias of Billy McGhee while he was in Colorado. She further acknowledged that she had heard about her brother's involvement in a conspiracy to commit aggravated robbery and his conviction for aggravated motor vehicle theft in Colorado. She stated that she had no knowledge of her brother's Colorado convictions for first degree criminal trespass, theft, and reckless endangerment. She also denied knowledge of any other alias names used by her brother. Notwithstanding this information, Ms. Hood maintained that he was a decent person. She was then questioned regarding her brother's Shelby County, Tennessee convictions, including his 2000 conviction of vandalism over $500, his 2000 conviction of attempted burglary of a building, his 2000 conviction of criminal trespass, his 1994 conviction of theft of property over $1000, his 1994 conviction of reckless endangerment with a deadly weapon, his 1994 conviction of theft over $500, his 1994 conviction of contempt of court, his 1989 conviction of receiving/concealing stolen property, his 1987 conviction of escape, and his 1986 conviction of attempt to commit grand larceny. She stated that she could not recall these convictions and still maintained that the defendant was a decent person.

On re-direct examination Ms. Hood maintained that she would always love her brother "no matter what." She stated that he was her brother and nothing would change that fact.

At the close of the proof, the trial court instructed the jury on the following statutory aggravating circumstances:

> One, that the defendant was previously convicted of one or more
> felonies other than the present charge, the statutory elements of which

involve the use of violence to the person. The state is relying upon the crimes of murder in the first degree, reckless endangerment, first degree kidnapping, second degree kidnapping, aggravated robbery, crime of violence [sic] deadly weapon, and menacing which are felonies involving the use of violence to the person. Proof of additional convictions may be considered by you only as they relate to the credibility of witnesses. Two, the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another.

The court then instructed the jury as to the following mitigating circumstances:

Mitigating circumstances, Tennessee law provides that in arriving at the punishment, the jury shall consider, as previously indicated, any mitigating circumstances raised by the evidence which . . . may include, but are not limited to the following: One, that the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of intoxication which was insufficient to establish a defense to the crime, but which substantially [a]ffected his judgment. Two, that the defendant gets along well in a structured environment such as in jail. Three, that the defendant has family members who love him and want him to live. Four, that the defendant received a gunshot wound to the head. Five, any other mitigating factor which is raised by the evidence produced by either the prosecution or the defense at either the guilt or sentencing hearing. That is, you shall consider any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

Following submission of the instructions, the jury retired to consider the verdict at 4:00 p.m. At 5:35 p.m., the jury returned its verdict, finding that the state had proven the aggravating circumstance (i)(2), the defendant was previously convicted of one or more violent felonies other than the present charge, beyond a reasonable doubt. The jury further found that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. In accordance with their verdicts, the jury sentenced the defendant to death for the first degree murder of Toni Banks.

## I. Failure of Trial Court to Merge Verdicts

Although not raised by the defendant, the record reflects that, consistent with the jury verdicts, the trial court entered one judgment for murder committed during the perpetration of a felony and one count of premeditated first degree murder. In *State v. Howard*, 30 S.W.3d 271 (Tenn.

2000), our supreme court held that premeditated murder and felony murder are not separate offenses, but different theories of guilt for the crime of first degree murder. *Id*. at 274 n.4. Therefore, separate convictions for both felony murder and premeditated murder based upon the same occurrence must be merged. In this case, when the trial court found the evidence sufficient to support both verdicts, the trial court should have merged the guilty verdicts into one judgment for first degree murder. *See State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998). Defendant's conviction for felony murder must be merged with his conviction for premeditated murder, and this case is remanded for entry of judgments consistent with this opinion.

Similarly, the trial court also entered judgments for each of the alternative counts of theft of property under $500. The defendant was sentenced to 11 months, 29 days for each theft-of-property conviction. The judgment forms reflect that the sentence had been served in the matter as a result of pretrial jail credits. The forms also indicate that the two theft sentences were ordered to be served concurrently with one another. It appears that two judgments were entered for the same offense. Dual convictions and sentences for theft of property based upon the same evidence violate principles of double jeopardy. *See State v. Denton*, 938 S.W.2d 373, 382 (Tenn. 1996). The proper remedy is to merge the convictions. Although it has no effect upon the effective sentence and no challenge is made on appeal to the theft convictions, we remand for entry of an order merging the theft convictions.

## II. Refusal to Permit Defendant to Proceed *Pro Se*

During a motion hearing regarding defense counsel's request to withdraw from further representation of defendant, defense counsel stated to the court, "I also don't know if [the defendant] would rather represent himself. I don't know that. But if the court would like to ask him about that." The trial court addressed the issue although no motion to proceed *pro se* had formally been made either orally or in writing and there was no indication from the defendant that he wished to proceed *pro se* other than his statement that he had a constitutional right to be "heard by himself."[3]

The trial court noted that the case had been pending for approximately 14 months and that trial was scheduled to begin a week and a half later. The trial court characterized trial counsel as an outstanding and experienced attorney, with access to law books, investigators, and a support staff. The court further stated that to permit the defendant to proceed *pro se* at this stage would require a resetting of the case for six to eight months. The trial court rejected any scheme employed to delay the trial, noting that if such requests were allowed, trials would be continued indefinitely. The trial court stated that the defendant was going to have a lawyer, and that, in fact, he was represented by two attorneys. The court further remarked that if the defendant "acted up" or "spoke out" he was going to be removed from the courtroom. Later, defense co-counsel informed the court

---

[3] This comment was made in the context of defense counsel's motion to withdraw. During argument of the motion to withdraw, defendant interrupted the trial court mid-sentence, stating "I want her off my case, Your Honor." In response, the trial court warned the defendant that he would be removed from the courtroom if he continued to act up or speak up. Defendant then remarked that he had a "Tennessee constitutional . . . one declaration where I've got the right to be heard by myself."

-11-

that the defendant "is prepared to go to trial, representing himself, on the scheduled date of April the 26." To this announcement, the trial court responded that no valid reason existed to permit the defendant to represent himself. The trial court rejected the defendant's pronouncement that he would be ready to represent himself in a capital murder trial in one week. The court added that "any reasonable person looking at this situation would have to conclude that he would not be ready and is not capable of representing himself on this short notice in a capital case." The court rejected the propriety of the defendant's giving the court a one week notice that he intended to represent himself in a capital murder trial.

The defendant complains on appeal that the refusal to permit him to proceed *pro se* in this matter amounted to constitutional error requiring reversal. The defendant concedes that this issue was not preserved in the motion for new trial. Nonetheless, he asserts that this court should review the issue on its merits because it is an error affecting the substantial rights of the accused. *See* Tenn. R. Crim. P. 52(b).

In exercising our discretion whether to entertain plain error review under Tennessee Rule of Criminal Procedure 52(b), the Tennessee Supreme Court has directed that we examine five factors, all of which must be present in a case for review under Rule 52(b) to be appropriate. These five factors are as follows: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting *State v. Adkisson*, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994)). The defendant asserts that all five factors are present requiring plain error review by this court. Specifically, he asserts that the trial court failed to query the defendant to determine whether he understood the perils of self-representation and whether his waiver of counsel was knowing and intelligent. He also claims that the record clearly establishes what occurred in the trial court, that the trial court's failure to apply this rule affected a substantial right of the defendant, that no tactical reason exists for not including the issue in the motion for new trial, and that consideration of the issue is necessary to do substantial justice. We agree and proceed with our review.

A criminal defendant has a right to be represented by counsel or to represent himself and proceed *pro se* without the assistance of counsel. *See* U.S. Const., amend. IV; Tenn. Const. art. I, § 9; *Faretta v. California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 2533 (1975); *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984)**.** The right to represent oneself exists "despite the fact that its exercise will almost surely result in detriment to both the defendant and the administration of justice." *See State v. Fritz*, 585 P.2d 173 (Wash. Ct. App. 1978). The right is not absolute, however. To activate the right of self-representation, the defendant must: (1) timely assert the right to proceed *pro se*; (2) clearly and unequivocally exercise the right; and (3) knowingly and intelligently waive his or her right to assistance of counsel. *State v. Herrod*, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988). Additionally, Rule 44(a) of the Tennessee Rules of Criminal Procedure provides that indigent defendants should execute a written waiver before being allowed to proceed *pro se*.

We first observe that the record before us contains no explicit written waiver of the right to counsel or a motion to proceed *pro se* filed by either the defendant or his counsel. *See* Tenn. R. Crim. P. 44(a). The technical record, however, contains several *pro se* motions submitted by the defendant. Consequently, we conclude that had the defendant been adamant in his desire for self-representation, he clearly was capable of filing an appropriate waiver.

Next, the general rule is that a motion to proceed *pro se* must be made prior to trial in order to be considered timely. *Northington*, 667 S.W.2d at 62. The right may not be exercised for the purpose of delaying the trial or obstructing justice, and even an unequivocal request may be waived by subsequent words or conduct. *State v. Luvene*, 903 P.2d 960, 966 (Wash. 1995) (*en banc*); *see, e.g.*, *United States v. Mackovich*, 209 F.3d 1227, 1237 (10th Cir. 2000) (requests made six to ten days before trial "were merely a tactic for delay"); *United States v. George*, 56 F.3d 1078, 1084 (9th Cir. 1995) (request made on eve of trial untimely); *United States v. Frazier-El*, 204 F.3d 553, 560 (4th Cir. 2000) (the "right does not exist, however, to be used as a tactic for delay"). The defendant's oral "request" in this case was made a week and a half before the start of the trial. The case had been pending for 14 months, and the defendant had been represented by the same counsel throughout the proceedings. The defendant had not provided any indication of his desire for self-representation or his dissatisfaction with appointed counsel prior to the hearing on April 19, 2004. The trial began on May 3, 2004. The reference to self-representation, which consisted of a statement that he would be ready to proceed *pro se* on the scheduled trial date, was made through co-counsel after the trial court denied lead counsel's motion to withdraw. We agree with the trial court and conclude that defendant made this remark about representing himself as an attempt to delay the trial.

Our next inquiry is whether the defendant's request to proceed *pro se* was clear and unequivocal. The only evidence of a request by the defendant to proceed *pro se* included lead counsel's statement that "I also don't know if Mr. Hood would rather represent himself" and co-counsel's announcement that "he is prepared to go to trial, representing himself, on the scheduled date of April the 26th." The defendant's statement in which he interrupted the court and asserted that he had a right to be heard related to his exclamation in court that he wanted lead counsel removed from his case. This statement did not relate to his desire to proceed *pro se*. Moreover, the defendant never made any indication, through counsel or otherwise, that he wished to have co-counsel removed. Accordingly, we cannot conclude that the defendant's statements made through counsel constituted an unequivocal assertion of the right. *See, e.g.*, *Reese v. Nix*, 942 F.2d 1276, 1281 (8th Cir. 1991) ("I don't want no counsel then" was not a clear and unequivocal *pro se* demand requiring *Faretta* inquiry); *Frazier-El*, 204 F.3d at 558 (assertion of the right of self-representation "must be . . . clear and unequivocal").

The constitutional right of self-representation is waived if not timely and unequivocally asserted. *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir. 1990). We conclude that the defendant neither timely nor unequivocally asserted his right to self-representation. Moreover, we recognize that courts should indulge every reasonable presumption against finding that a defendant has waived the right to counsel. *State v. Vermillion*, 51 P.3d 188, 193 (Wash. Ct. App. 2002). One purpose is "to protect trial courts from manipulative vacillations by defendants." *State v. DeWeese*, 816 P.2d 1, 4 (Wash. 1991). There is no indication in the record that the defendant intended to

waive his right to have representation through co-counsel. Rather, he wanted lead counsel removed as counsel of record. Consideration of the defendant's delay in asserting his desire to proceed *pro se*, his dissatisfaction with the trial court's ruling regarding lead counsel, an absence of reasons for his dissatisfaction with lead counsel's performance, and his implication that he did not want co-counsel removed from his case convinces this court that the purpose of his request was a delay tactic or other tactic to disrupt the court proceedings. Absent an unequivocal and timely request, the trial court was under no duty to advise the defendant of the perils of self-representation or to determine whether the waiver of counsel was knowingly and voluntarily entered.

Finally, we conclude that the defendant abandoned any intention to represent himself when he did not pursue the issue of self-representation after the court rejected any notion that the defendant should proceed *pro se. See McKaskle v. Wiggins*, 465 U.S. 168, 182, 104 S. Ct. 944 , 953 (1984) (defendant can waive his right to self-representation by allowing counsel to participate in trial); *accord Wilson v. Walker*, 204 F.3d 33, 38 (2d Cir. 2000) (failure to reassert a desire to proceed *pro se* constituted a waiver). For the foregoing reasons, we reject the propositions that the request was unequivocal and timely. Accordingly, although the better practice would have been for the court to warn the defendant of the risks of self-representation, the court was under no duty to do so because the request was neither timely nor unequivocal.

### III. Refusal to Permit Defense Counsel to Withdraw

Lead counsel, an assistant public defender, both orally and by written motion, requested permission to withdraw as counsel of record for the defendant. Counsel related that the public defender's office was appointed to represent the defendant in two separate capital murder cases on February 19, 2003. Shortly thereafter, counsel was assigned to both cases. She maintained that throughout her representation of the defendant, "he has been openly hostile to counsel, making communications difficult, at best." The situation escalated on April 16, 2004, when counsel was discussing motions with defendant in the "lock up" area of the court. She stated that the defendant "became threatening toward counsel, in the presence of Officers Burress and Brown, stating he would do whatever it takes to have her removed from his cases, even if it meant he would pick up another charge." Officer Burress advised counsel to leave the room. Officer Burress related the incident to the court. The defendant later told co-counsel and two investigators that he intended to hit lead counsel. Because of this incident, law enforcement personnel were present when lead counsel and the defendant conferred, rendering confidential communication difficult. She stated that she had never been threatened by a client in her 14 years as an attorney. Counsel concluded that she was unable to function effectively under this situation.

The trial court denied the oral motion and entered a written order entered on April 21, 2004. In denying the motion, the trial court made the following findings:

> [T]here has been concern regarding Mr. Hood's conduct and actions the entire time this case has been pending in this court – certain precautions have been taken on previous hearings. Additional

-14-

precautions were taken today. No attorney should . . . have his or her safety jeopardized because of a client's actions.

But I will say that Mr. Hood, obviously being in custody, will, for today's purposes and any future court dates, be restrained – handcuffs and leg restraints – and members of the DRT team will assist in ensuring that he is not able to cause harm to anyone. His conduct may well pose a threat to everyone in the system with whom he comes in contact, and while I certainly understand Ms. Thackery's concern, and I respect her statement, and I know that she wouldn't make a request like that for any dilatory reason or frivolously, I am going to ask that she stay on this case given the fact that we are a couple of weeks away from trial – a week and a half away from trial, the age of the case, the fact that he has two murder cases pending. We need to get the first one tried before we move onto the second one.

  Ms. Thackery is an experienced trial attorney; will do an outstanding job in representing Mr. Hood's interests; and anytime he's brought – I will certainly not ask Ms. Thackery nor expect her to go to the jail to visit Mr. Hood. She's welcome to visit him here in lockup anytime she needs to try to speak with him here in lockup . . . a completely secure area where we can ensure that Mr. Hood is sufficiently restrained to . . . make certain that there will be no problem for Ms. Thackery.

The defendant now complains that the trial court erred in denying counsel's motion to withdraw. The defendant has failed to cite to any legal authority supporting his argument. Accordingly, this issue is waived. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Notwithstanding, because of the seriousness of the penalty imposed in this capital case, we elect to review the issue on its merits.

The decision whether to allow counsel to withdraw in a pending criminal matter is vested in the sound discretion of the trial court, and the decision will not be reversed on appeal unless an abuse of discretion is shown. *State v. Russell*, 10 S.W.3d 270, 274 (Tenn. Crim. App.), *perm. app. denied* (Tenn. 1999). The trial court refused counsel's motion, noting that this matter had been pending for over one year, that counsel was well-qualified, and that the court was not going to permit intentional delays by the defendant.

A review of the record supports the conclusions and ruling of the trial court. The trial court accredited counsel's assertions that the defendant made threats against her person. Although we do not consider these threats insignificant and share a strong concern for counsel's safety, there

is no indication of the nature of the threats or the reason why the defendant was dissatisfied with counsel.

Although an indigent criminal defendant is entitled to representation by counsel, this right does not include the right to counsel of choice or to a special rapport, confidence, or even meaningful relationship with appointed counsel. *See State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000), *cert. denied*, 533 U.S. 953, 121 S. Ct. 2600 (2001). The trial court found that counsel was more than qualified to represent the defendant. The record fails to indicate that counsel was unable to effectively defend the defendant against the charge of capital murder. She had been counsel of record for 14 months, during which time the defendant had no complaints with her performance. Indeed, the motion was made a week and a half prior to the start of trial. Had the motion been allowed, further delay would have been necessary for the defendant to prepare his case *pro se* or retain other counsel. *See Russell*, 10 S.W.3d at 270. Finally, the trial court enacted security measures to protect both counsel and persons in the courtroom. There is no indication that counsel had any further adverse incident with the defendant. In fact, in requesting the removal of restraints during the trial, counsel related that she had visited the defendant at the jail without incident.

Based upon the record before this court, we conclude that the defendant has failed to demonstrate that the trial court abused its discretion in denying counsel's motion to withdraw. Accordingly, this issue is without merit.

### IV. Presence of Uniformed Detention Response Team Members

On the first morning of trial, defense counsel, relying upon a motion previously filed, requested that the defendant not be required to wear handcuffs and shackles while in the presence of the jury. In support of this request, counsel related that she and co-counsel had visited the defendant at the jail and had encountered no problems. The trial court denied the request, noting that the defendant was wearing civilian clothing. The court informed counsel that the defendant would be permitted to have his shirt untucked to conceal the fact that he was handcuffed. The court also noted that the fact that his feet were shackled would not be noticeable. Additionally, the court recounted the defendant's history in this matter, specifically noting the defendant's threats to counsel. In this regard, the trial court considered the defendant's Colorado convictions and sentences and the fact that he was facing the death penalty in Tennessee. The court concluded that there was little to deter the defendant from assaulting his attorney(s) should the trial not go the way he wanted.

During a recess in the voir dire process, counsel raised concern about the presence of the Detention Response Team (DRT) officers. Specifically, counsel noted that the officers' uniforms clearly identified them with the words "Detention Response Team" printed on front and back. The trial court noted that the two officers had been seated throughout the proceeding and were not parading before the jury. The court found that the design on the uniform shirt or jacket did not prejudice the defendant. Later during the voir dire process, the trial court did request that the same two officers be present all day every day for the rest of the trial, to understand the rulings, to be aware of what was going on, and to minimize the officers' visibility and presence. The trial judge

explained that he did not want a change of officers during the middle of the proceedings. The trial court did grant counsel's request to have the DRT members move one seat down to permit counsel to sit next to the defendant as necessary during the trial.[4]

Counsel again objected to the handcuffs and shackles after the defendant expressed to her that it was inherently prejudicial. At this juncture, counsel again challenged the presence of two uniformed Detention Response Team members who were seated on either side of the defendant. Counsel noted that Officer Green was six foot one and weighed 215 pounds and that Officer Wormley was six feet and one inch tall and weighed 198 pounds. Counsel argued that the presence of the officers indicated to the jury that the defendant is "dangerous, scary, and that they will be inherently prejudiced by that." The trial court reiterated its previous rulings, noting that "[t]he two DRT officers that are here during the trial . . . conduct themselves in an extremely professional manner. Show no expression yea or nay with regards to things that are said during the course of the trial. And so, they do not . . . prejudice the defendant's rights in this case in any way."

The defendant complains that the presence of uniformed members of the Detention Response Team denied him a fair trial. He notes that two witnesses emphasized the officers' presence. Specifically, the defendant refers to Donald Armstrong, who had initially pointed to a DRT officer in response to making an in-court identification of the defendant and the penalty phase testimony of Officer Murckson, who in response to questioning as to the function of the DRT, replied, "That's Detention Response Team. There (sic) are the ones who patrol and help control inmates [who are] high risk or violent." Officer Murckson also identified the defendant as "the inmate . . . sitting between the [sic] both D.R.T. members."

We initially observe that the defendant has failed to cite to any legal authority supporting his argument. Accordingly, this issue is waived. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Notwithstanding waiver, we elect to review his complaint that the officers' presence in the courtroom during the trial prejudiced his right to a fair trial. The defendant, we note, does not challenge the propriety of the handcuffs and shackles on appeal.

In *Holbrook v. Flynn*, 475 U.S. 560, 106 S. Ct. 1340 (1986), the United States Supreme Court defined the standard by which security presence in the courtroom may be measured in relation to a defendant's constitutional right to a fair trial. In reviewing a petition from a defendant convicted in a Rhode Island state court, the Supreme Court concluded that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" is not an inherently prejudicial practice and does not violate the fundamental principles of the criminal justice system. *Id*. at 568, 106 S. Ct. at 1345. When a courtroom security arrangement is challenged as inherently prejudicial, the question is whether there is "an unacceptable risk . . . of impermissible factors coming into play." *Id*. at 570, 106 S. Ct. at 1346-47**.**

---

[4] The defendant asserts in his brief that, in Shelby County, the defendants are seated in a row of chairs two to three feet behind counsel. The backs of these chairs rest against the "bar" which separates the audience seating area.

*Holbrook* involved a challenge to four uniformed officers seated behind six defendants. In finding the defendants were not entitled to relief, the Supreme Court stated:

> We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial. But we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section. Even had the jurors been aware that the deployment of troopers was not common practice in Rhode Island, we cannot believe that the use of the four troopers tended to brand respondent in their eyes with an unmistakable mark of guilt. Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings.

*Id*. at 571, 106 S. Ct. at 1347 (citations and internal punctuation omitted).

As the Supreme Court has recognized, "[J]urors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance." *Id*. at 567, 106 S. Ct. at 1347. Generally, the trial court, which has presided over the proceedings, is in

> the best position to make determinations regarding how to achieve [the] primary purpose [of ensuring a fair trial], and absent some abuse of the trial court's discretion in marshalling the trial, an appellate court should not redetermine in retrospect and on a cold record how the case should have been better tried.

*State v. Franklin*, 714 S.W.2d 252, 258 (Tenn. 1986). It has also been recognized that the use of security personnel can be justified as a necessary measure to prevent escape, to protect those present in the courtroom, and to maintain order during the trial. *Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057 (1970); *Woodards v. Cardwell*, 430 F.2d 978 (6th Cir. 1970); *State ex rel. Hall v. Meadows*, 215 Tenn. 668, 389 S.W.2d 256 (1965).

Recently the United States Supreme Court revisited the propriety of shackling a defendant in a courtroom. *See Deck v. Missouri*, __ U.S. __, 125 S. Ct. 2007 (2005). The nation's highest court held that

> courts cannot routinely place defendants in shackles or other physical restraints visible to the jury. . . . The constitutional requirement, however, is not absolute. It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling.

*Id*. at __ , 125 S. Ct. at 2014-15. In this regard, the Supreme Court recognized the need to restrain dangerous defendants to prevent courtroom attacks or the need to give trial courts

latitude in making individualized security determinations. *Id*. at __, 125 S. Ct. at 2014. The Court also acknowledged the potential for tragedy that can result if judges are not able to protect themselves and their courtrooms. *Id*. at __, 125 S. Ct. at 2014-15. The Court advised, however, that such determinations must be case specific; "that is to say, it should reflect particular concerns, say special security needs or escape risks, related to the defendant on trial." *Id*. at __, 125 S. Ct. at 2015. Thus, the Court concluded that, "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Id*. at __, 125 S. Ct. at 2014.

Although this standard has not yet been applied to security personnel in the courtroom, we conclude that the holding in *Deck v. Missouri* is a reasonable rule that should be applied to any restraint imposed on a criminal defendant in the courtroom. In the present case, the trial court acknowledged (1) defense counsel's recitation of threats made to her by the defendant, (2) the 500-year prison sentence awaiting the defendant in Colorado, (3) the need to protect everyone in the courtroom, (4) the possible imposition of the death penalty in two cases in Tennessee, and (5) past incidents of violence by criminal defendants in this particular courtroom. The trial court then determined that it was necessary to impose restraints including handcuffs, shackles, and the assistance of members of the DRT team. The record supports the trial court's finding that the defendant posed a substantial security risk for the courtroom and that the circumstances warranted the use of restraints. *See United States v. Amaro*, 816 F.2d 284, 285 (7th Cir.), *cert. denied*, 481 U.S. 1031, 107 S. Ct. 1961 (1987). Moreover, the defendant did not establish that the deployment of the DRT officers in the courtroom prejudiced his trial. *See State v. Taylor*, 771 S.W.2d 387, 396 (Tenn. 1989) (holding that defendant under guard in courtroom was not prejudiced). Accordingly, we cannot conclude that, under the circumstances of this case, the trial court abused its discretion in imposing additional security measures in the courtroom.

## V. Sufficiency of the Evidence

The defendant alleges that the evidence is insufficient to support his conviction of the premeditated murder of Toni Banks. In support of this argument, the defendant refers to evidence introduced at trial relating that both he and Toni Banks were consuming alcohol the day and evening preceding the murder. He also cites to the fact that the two were quarreling throughout the afternoon and evening. The defendant contends that there is no evidence that he threatened Toni Banks or declared an intent to harm her. He alleges that there is no proof of plans to conceal the murder prior to its commission. The defendant asserts that the only proof to support a finding of premeditation is the fact that Toni Banks was not armed. This proof, he contends, is insufficient to support a conviction for first degree premeditated murder.

When a challenge is made on appeal to the sufficiency of the convicting evidence, this court is guided by certain well-established principles. First, a jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571

-19-

S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *See generally State v. Adkins*, 786 S.W.2d 642, 646 (Tenn. 1990); *State v. Burlison,* 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). Instead, the defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994), *cert. denied*, 513 U.S. 1086, 115 S. Ct. 743 (1995). Moreover, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992), *cert. denied*, 507 U.S. 954, 113 S. Ct. 1368 (1993). In *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App.), *perm. app. denied* (Tenn. 1990), this court held these rules applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.

The defendant was convicted of premeditated first degree murder. First degree murder is "the premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1)(2003). Tennessee Code Annotated section 39-13-202(d) defines premeditation as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The element of premeditation is a question of fact to be resolved by the jury and may be established by proof of the circumstances surrounding the killing. *State v. Suttles*, 30 S.W.3d 252, 260 (Tenn.), *cert. denied*, 531 U.S. 967, 121 S. Ct. 401 (2000). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the killer's conduct in light of the surrounding circumstances. Although there is no strict standard governing what constitutes proof of premeditation, circumstances from which a jury may infer premeditation include planning activity by a defendant prior to the killing, the defendant's prior relationship with the victim, and the manner of the killing. *State v. Hall*, 958 S.W.2d 679, 704 (Tenn. 1997); *see also State v. Jones*, 15 S.W.3d 880, 889 (Tenn. Crim. App. 1999); *State v. Schafer*, 973 S.W.2d 269, 273 (Tenn. Crim. App. 1997); *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995); *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993). Thus, for example, our supreme court has held that premeditation may be inferred from a defendant's use of a deadly weapon upon an unarmed victim, the cruelty of the killing, declarations by a defendant of an intent to kill, the defendant's procurement of a weapon, a defendant's preparations prior to a killing for concealment of the crime, and calmness immediately after the killing. *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997), *cert. denied*, 523 U.S. 1083, 118 S. Ct. 1536 (1998).

Applying these factors, there are numerous circumstances in this case from which the jury could conclude that the murder was premeditated: (1) The victim was unarmed; (2) the victim and the defendant had been involved in a romantic relationship and were quarreling; (3) the proof strongly indicated that the victim was asleep in her bed as she was dressed only in a tee-shirt and was lying prone on a mattress; (4) the gun was fired within six inches from the victim's forehead, assuring her death; and (5) the defendant stated his intentions to get rid of Toni Banks. Viewing the evidence and inferences therefrom in a light most favorable to the state, this court finds sufficient evidence to support the jury's finding of premeditation.

## VI.  Admission of Prior Bad Acts of the Defendant

Prior to trial and pursuant to a motion filed by the state, a hearing was held to determine the admissibility of proof of another murder and theft of property allegedly committed by the defendant. The state's purpose in seeking admission of this evidence was to present proof as to the defendant's motive for killing Toni Banks. The state posited that Toni Banks knew too much about these prior crimes and that her murder was necessary to prevent the defendant's arrest. This position was based upon Joseph Jackson's testimony that the defendant had told him during a telephone conversation that Toni Banks knew to much and that she had to go.

During this hearing, the trial court heard proof from Joseph Jackson, the accomplice to the alleged murder and theft. The trial court also heard statements by the prosecution that corroborating proof by Panyanouvong's widow and members of the Banks family would be presented linking the property taken from the Panyanouvong home to the defendant. Defense counsel objected to the admission of any and all of this proof. In this regard, defense counsel cited to Jackson's lack of credibility, the highly prejudicial nature of the evidence, and its irrelevance to the Banks murder. Defense counsel also commented that Jackson's accusation was self-serving in nature.

In making its decision, the trial court noted that the murder of Phimphone Panyanouvong would not have been solved but for the information provided by Jackson. The trial court further acknowledged that decisions regarding credibility of witnesses are left to the jury. With these acknowledgments, the trial court found that there was sufficient credibility to Jackson's testimony to satisfy the clear and convincing provision of Tennessee Rule of Evidence 404(b). The court further found that:

> the probative value certainly outweighs any prejudicial effect. The testimony regarding the phone conversation is extremely probative, and short of witnessing the murder himself, I can't imagine proof that would be much more probative than overhearing or being told statements such as Mr. Jackson says he was told over the phone by this defendant. And so I think clearly the probative value outweighs the prejudicial effect.

I think that proof of this sort would be highly relevant to establish motive, to establish intent, lack of mistake, identity. And there are several factors that are very relevant, and I think if the jury elects to believe the testimony of Mr. Jackson after they hear that testimony along with all the other proof in the case – several factors that would be put before the jury through Mr. Jackson's testimony – those four that I mentioned being the four that come to mind.

The trial court rejected defense counsel's request to limit the evidence to the burglary and theft, concluding that the murder lent credibility to Joe Jackson's statement.

During the defendant's trial, the state presented the testimony of numerous witnesses who referenced the December 27, 2000 murder of Phimphone Panyanouvong and the theft of his property. Thong Panyanouvong described the events of December 27, 2000, including finding her murdered husband's body near the front door of their home. Jackson related his "fencing" relationship with the defendant and the events of December 27, 2000, which included the defendant admitting that he had shot a man and that the defendant had taken the man's car and numerous personal belongings from his house. Bruce Griffey, Jackson's attorney, testified that Jackson had contacted him from jail, explaining that he had information about some unsolved crimes. Lisa Matthews, Jackson's girlfriend, related that she placed three-way telephone calls for Jackson to the defendant while Jackson was in jail. During these conversations, Matthews overheard Jackson telling the defendant that he was not in jail for what they had done. She also overheard the defendant telling Jackson that "she had to go, and basically that she knew too much." Various members of Toni Banks's family, James Banks, Percy Foster, James Banks, Jr., and Carol Webb, testified that they were in possession of various items that matched the description of those items taken from the Panyanouvong home. Various law enforcement officers were called to testify regarding the identification of property taken during the Panyanouvong murder.

After the testimony of the eighth witness called by the state, the trial court issued a cautionary instruction to the jury regarding the other crimes evidence:

Ladies and gentlemen, the testimony you have heard today regarding the defendant's alleged commission of crimes other than that for which he is on trial, i.e. relating to the death of Mr. Panyanouvong, may not be considered to prove the defendant's disposition to commit the type of crime for which he is on trial. This evidence may only be considered by you for the limited purpose of determining whether it proves the defendant's identity, that is, such evidence may[]be considered by you if it tends to establish the defendant's identity in the case on trial. Motive, that is, to show – that is, such evidence may[]be considered by you if it tends to show a motive of the defendant for the commission of the offense presently charged, or the defendant's intent. That is, such evidence may[]be considered by you if it tends to establish that the defendant actually intended to commit

-22-

the crime with which he is presently charged. Such evidence of other crimes may not be considered for any purpose other than those specifically stated herein.

The trial court repeated the instruction at the end of the guilt phase.

On appeal, the defendant contends that the trial court erred in admitting any and all evidence involving his alleged murder of Phimphone Panyanouvong and the theft of his property. The defendant complains that the trial court's ruling created "devastatingly unfair prejudice," and in support thereof, he references the order of the state's witnesses. Moreover, he asserts that any proof regarding the Panyanouvong crimes was irrelevant to the issue whether he had murdered Toni Banks. The defendant further complains that prejudicial impact of the other crimes evidence was compounded by the state's use of the other crimes evidence in its closing argument and that had the other crimes evidence been excluded, "a reasonable jury could have returned a verdict of either voluntary manslaughter or second degree murder."

Evidence of a defendant's prior crimes, wrongs, or acts is not generally admissible to prove that he committed the crime in question. Tenn. R. Evid. 404. The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005). The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. *Id.* at 239*; see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996).

Notwithstanding the general rule, evidence of a defendant's prior crimes, wrongs or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). Thus, evidence of a defendant's character may become admissible when it logically tends to prove material issues which fall into one of three categories: (1) the use of "motive and common scheme or plan" to establish identity, (2) to establish the defendant's intent in committing the offense on trial, and (3) to "rebut a claim of mistake or accident if asserted as a defense." *Thacker*, 164 S.W.3d at 239 (citing *McCary*, 922 S.W.2d at 514). To admit such evidence, the rule specifies three prerequisites:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court must find by clear and convincing evidence that the defendant committed the other crime. *Id.*, Advisory Commission Cmts.; *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997); *State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985).

In reviewing a trial court's decision to admit or exclude evidence, an appellate court may disturb the lower court's ruling only if there has been an abuse of discretion. *Thacker*, 164 S.W.3d at 240. Its determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *See DuBose*, 953 S.W.2d at 652.

In the present case, the trial court conducted a jury-out hearing on the other crimes evidence; the court determined that a material issue existed other than conforming conduct; the court stated its reasons on the record; the trial court determined that the evidence was more probative than prejudicial; and the trial court found that the defendant committed the other crimes by clear and convincing evidence. Accordingly, because the trial court substantially complied with the requirements of Rule 404(b), this court will review the trial court's determination for an abuse of discretion. Under this standard of review, this court will only reverse the trial court's ruling if the lower court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004).

Evidence of the Panyanouvong murder and burglary was introduced by the state to show motive and premeditation. The trial court properly instructed the jury that the evidence could be considered for the limited purpose of determining whether it tends to show motive. Evidence proving motive necessarily serves the purpose of completing the story of the crime. *See State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). Motive is a relevant circumstantial fact that refers to why a defendant did what he did. The motive and intent of the defendant in the commission of a murder are almost always critical issues. *State v. Gentry*, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993). Evidence of motive is often pertinent as the basis to infer that the act was committed, to prove requisite mental state, or to prove the identity of the actor. *See* 22 C. Wright & K. Graham, Jr., *Federal Practice and Procedure Evidence* § 479 (1978). Indeed, the defendant's possession of a motive strengthens the inference that the death of the victim was caused by an intentional act rather than by accident. Finally, in making a risk versus benefit analysis in this case, we cannot conclude that the trial court abused its discretion in determining that the probative value of the evidence outweighed its prejudicial impact. Accordingly, the admission of the evidence was not error.

## VII. Instruction as to (i)(2) Aggravator

Prior to the commencement of the penalty phase, the state asserted that it would use the defendant's prior convictions of murder in the first degree, reckless endangerment, first degree kidnapping, second degree kidnapping, aggravated robbery, crime of violence with a deadly weapon, and menacing to establish the existence of the (i)(2) aggravating circumstance. The trial court then

conducted a hearing outside the presence of the jury to determine whether the defendant's prior convictions involved the use of violence to the person. *See State v. Sims,* 45 S.W.3d 1, 11-12 (Tenn. 2001). Finding that the offenses involved the use of violence, the trial court allowed the state to introduce evidence of the prior convictions. *See State v. Powers*, 101 S.W.3d 383, 400-01 (Tenn. 2003). At the conclusion of the penalty phase, the trial court instructed the jury as follows:

> One, that the defendant was previously convicted of one or more felonies other than the present charge, the statutory elements of which involve the use of violence to the person. The state is relying upon the crimes of murder in the first degree, reckless endangerment, first degree kidnapping, second degree kidnapping, aggravated robbery, crime of violence deadly weapon, and menacing which are felonies involving the use of violence to the person. Proof of additional convictions may[]be considered by you only as they relate to the credibility of witnesses. Two, the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another.

The defendant now contends that the question whether prior offenses involved the use of violence was a question for the jury to resolve beyond a reasonable doubt. Essentially, the defendant complains that the procedure set forth in *Sims* in which the trial court considers the underlying facts of the prior offenses to determine whether the elements of the offenses involved the use of violence to the person violates the dictates of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002).

Our supreme court recently rejected this same argument in *State v. Cole*, 155 S.W.3d 885, 900 (Tenn. 2005). In doing so, our high court acknowledged that "*Apprendi* and its progeny preclude judges from finding 'additional facts,' that increase a defendant's sentence beyond the 'statutory maximum,' which is defined as the maximum sentence a judge may impose *'solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.'*" *Cole*, 155 S.W.3d at 903 (quoting *Blakely v. Washington*, 542 U.S. 296, __, 124 S. Ct. 2531, 2537 (2004)). The court differentiated the principles of *Apprendi* from the *Sims* procedure and concluded that "[t]he *Sims* procedure involves a legal determination, and as such this procedure does not transgress the dictates of *Apprendi* and its progeny." *Id*. at 904.

The supreme court explained,

> The (i)(2) aggravating circumstance requires only that the *statutory elements* of the prior felony involve the use of violence to the person. The *Sims* procedure authorizes trial judges merely to examine the

facts, record, and evidence *underlying* the prior conviction to ascertain which "statutory elements" served as the basis of the prior felony conviction. This is a legal determination that neither requires nor allows trial judges to make factual findings as to whether the prior conviction involved violence. This legal determination is analogous to the preliminary questions trial judges often are called upon to decide when determining the admissibility of evidence.

*Id*. The supreme court further noted that "by making this legal determination, the trial court neither inflicts punishment nor usurps or infringes upon the jury's role as fact-finder." *Id*. The court observed that

[o]nce the trial court determines as a matter of law that the statutory elements of the prior convictions involve the use of violence, the jury must then determine as matters of fact whether the prosecution has proven the (i)(2) aggravating circumstance beyond a reasonable doubt and whether aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt.

*Id*. Accordingly, the trial court's procedure in the present case passes constitutional muster.

## VIII. Indictment Failed to Charge Capital Offense

The defendant asserts that "[a]ny fact that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt in order to satisfy the Fifth Amendment's Due Process Clause and the Sixth Amendment's notice and jury trial guarantees." In this regard, the defendant contends that the indictment against him failed to "include the facts that would qualify the [defendant] for the death penalty." The defendant's argument is based upon the premise that first degree murder is not a capital offense unless accompanied by aggravating factors. Essentially, the defendant complains that the indictment returned by the grand jury charges non-capital, first degree murder because the grand jury did not find any capital aggravating circumstances. Thus, the defendant alleges that to satisfy the requirements of *Apprendi v. New Jersey*, the indictment must include language of the statutory aggravating circumstance(s) to elevate the offense to capital murder.

The defendant's argument has been rejected on numerous occasions by our supreme court. *See State v. Reid*, 164 S.W.3d 286, 311-12 (Tenn. 2005); *State v. Robinson*, 146 S.W.3d 469, 499 (Tenn. 2004); *State v. Berry*, 141 S.W.3d 549, 558 (Tenn. 2004); *Holton*, 126 S.W.3d at 845; *see also State v. Stephen Lynn Hugueley*, No. W2004-00057-CCA-R3-CD, slip op. at 15 (Tenn.

Crim. App., Jackson, Mar. 17, 2005), *perm. app. granted* (Tenn. Aug. 22, 2005). In *Holton*, our high court explained that "*Apprendi* applies only to enhancement factors used to impose a sentence above the statutory maximum" and that "the death penalty is within the statutory range of punishment prescribed for first degree murder by the Tennessee General Assembly." *Holton*, 126 S.W.3d at 863 (*citing State v. Dellinger*, 79 S.W.3d 458, 466-67 (Tenn. 2002)); *see also State v. Odom*, 137 S.W.3d 572 (Tenn. 2004). The court further emphasized that "Tennessee's capital sentencing procedures require that a jury, not a judge, make the findings regarding the presence of aggravating circumstances and that the findings must be made beyond a reasonable doubt." *Odom*, 137 S.W.3d at 590-91 (citing *Holton*, 126 S.W.3d at 864); *see also* Tenn. Code Ann. § 39-13-204(f)(1) (2003). Tennessee's capital sentencing scheme does not require that aggravating circumstances be included in an indictment. *See State v. Reid*, 164 S.W.3d at 312. The defendant is not entitled to relief on this issue.

## IX. Constitutionality of Tennessee Death Penalty Scheme

The defendant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions. Included within his challenge that the Tennessee death penalty statutes violate the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and Article I, Sections 8, 9, 16, and 17, and Article II, Section 2 of the Tennessee Constitution are the following:

> 1. The defendant first asserts that Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, thereby rendering Tennessee death penalty statutory scheme unconstitutional. Specifically, he argues that the statutory aggravating circumstances set forth in Tennessee Code Annotated section 39-2-203(i)(2), (5), (6), and (7) have been so broadly interpreted, whether viewed singly or collectively, that they fail to provide such a "meaningful basis" for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death. We note that factors, (i)(5), (i)(6) and (i)(7), do not pertain to this case as none of these factors were relied upon by the state nor found by the jury. Thus, any individual claim with respect to these factors is without merit. *See, e.g., State v. Hall*, 958 S.W.2d 679, 715 (Tenn. 1997), *cert. denied*, 524 U.S. 941, 118 S. Ct. 2358 (1998); *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn.), *cert. denied*, 513 U.S. 1020, 115 S. Ct. 585 (1994). Moreover, the defendant's argument has been rejected by our supreme court on numerous occasions. *See State v. Vann*, 976 S.W.2d 93, 117-18 (Tenn. 1998) (Appendix); *State v. Keen*, 926 S.W.2d 727, 742 (Tenn. 1994), *cert. denied*, 532 U.S. 907, 121 S. Ct. 1233 (2001).

2.  The defendant next argues that imposition of the death penalty in this state is unconstitutional because the death sentence is imposed capriciously and arbitrarily in that:

(a)  Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty.  This argument has been rejected.  *See State v. Hines,* 919 S.W.2d 573, 582 (Tenn. 1995), *cert. denied,* 519 U.S. 847, 117 S. Ct. 133 (1996).

(b) The death penalty is imposed in a discriminatory manner based upon race, geography, and gender.  This argument has been rejected.  *See Hines*, 919 S.W.2d at 582; *Brimmer*, 876 S.W.2d at 87; *Cazes*, 875 S.W.2d at 268;  *State v. Smith*, 857 S.W.2d 1, 23 (Tenn.), *cert. denied*, 510 U.S. 996, 114 S. Ct. 561 (1993).

(c) Requiring the jury to agree unanimously to a life verdict violates *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S. Ct. 1227 (1990).  This argument has been rejected.  *See  Brimmer*, 876 S.W.2d at 87; *State v. Thompson*, 768 S.W.2d 239, 250 (Tenn. 1989);  *State v. King*, 718 S.W.2d 241, 249 (Tenn. 1986), *superseded by statute as recognized by State v. Hutchinson*, 898 S.W.2d 161 (Tenn. 1994).

(d)  There is a reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances.  This argument has been rejected.  *See Thompson*, 768 S.W.2d at 251-52.

3.  Finally, the defendant asserts that the appellate review process in death penalty cases is constitutionally inadequate.  Our supreme court has rejected this argument, as well.  *See Cazes*, 875 S.W.2d at 270-71;  *Harris*, 839 S.W.2d at 77.  Moreover, the supreme court has held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." *See State v. Bland*, 958 S.W.2d 651, 663 (Tenn. 1997), *cert. denied*, 523 U.S. 1083, 118 S. Ct. 1536 (1998).

**X. Review Pursuant to Tenn. Code Ann. § 39-13-206(c)**

This court is required by Tennessee Code Annotated section 39-13-206(c)(1)(D) and under the mandates of *Bland*, 958 S.W.2d at 661-74, to consider whether the defendant's sentence of death is disproportionate to the penalty imposed in similar cases. *See State v. Godsey*, 60 S.W.3d 759, 781-82 (Tenn. 2001). The comparative proportionality review is designed to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." *State v. Stout*, 46 S.W.3d 689, 706 (Tenn. 2001) (citing *Bland*, 958 S.W.2d at 662 (quoting *Pulley v. Harris*, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875 (1984)). If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate. *Stout*, 46 S.W.3d at 706 (citations omitted).

In conducting our proportionality review, this court must compare the present case with cases involving similar defendants and similar crimes. *See id.*, 46 S.W.3d at 706 (citation omitted); *see also Terry*, 46 S.W.3d at 163 (citations omitted). We select only from those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. *See State v. Carruthers*, 35 S.W.3d 516, 570 (Tenn. 2000), *cert. denied*, 533 U.S. 953, 121 S. Ct. 2600 (2001) (citations omitted); *see also Godsey*, 60 S.W.3d at 783.

We begin with the presumption that the sentence of death is proportionate with the crime of first degree murder. *See Terry*, 46 S.W.3d at 163 (citing *State v. Hall*, 958 S.W.2d 679, 799 (Tenn. 1997)). This presumption applies only if the sentencing procedures focus discretion on the "'particularized nature of the crime and the particularized characteristics of the individual defendant.'" *Terry*, 46 S.W.3d at 163 (citing *McCleskey v. Kemp*, 481 U.S. 279, 308, 107 S. Ct. 1756, 1775 (1987) (quoting *Gregg v. Georgia*, 428 U.S. 153, 206, 96 S. Ct. 2909, 2940-41 (1976)).

Applying this approach, in comparing this case to other cases in which the defendants were convicted of the same or similar crimes, this court looks at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved. *See Terry*, 46 S.W.3d at 164. Regarding the circumstances of the crime itself, numerous factors are considered including: (1) the means of death, (2) the manner of death, (3) the motivation for the killing, (4) the place of death, (5) the victim's age, physical condition, and psychological condition, (6) the absence or presence of provocation, (7) the absence or presence of premeditation, (8) the absence or presence of justification, and (9) the injury to and effect on non-decedent victims. *Stout*, 46 S.W.3d at 706 (citing *Bland*, 958 S.W.2d at 667); *see also Terry*, 46 S.W.3d at 164. Contemplated within the review are numerous factors regarding the defendant, including: (1) prior criminal record, (2) age, race, and gender, (3) mental, emotional, and physical condition, (4) role in the murder, (5) cooperation with authorities, (6) level of remorse, (7) knowledge of the victim's

helplessness, and (8) potential for rehabilitation. *Stout*, 46 S.W.3d at 706; *Terry*, 46 S.W.3d at 164.

In completing our review, we remain cognizant of the fact that "no two cases involve identical circumstances." *See generally Terry*, 46 S.W.3d at 164. Thus, our function is not to limit our comparison to those cases where a death sentence "is perfectly symmetrical," but rather, our objective is only to "identify and to invalidate the aberrant death sentence." *Terry*, 46 S.W.3d at 164 (citing *Bland*, 958 S.W.2d at 665).

The circumstances surrounding the murder in light of the relevant and comparative factors reveal that the defendant and Toni Banks had been involved in a romantic relationship and shared an apartment together in a Shelby County apartment complex. Toni Banks apparently was the breadwinner in the household, and the defendant was unemployed. During the day preceding her murder, Toni Banks went to work, returned home, and began doing laundry at the nearby apartment of her brother. During this time, the defendant was observed drinking in the common area of the apartment complex. Toni Banks also drank alcohol that evening. Sometime that evening, Toni Banks's children overheard their mother and the defendant arguing. The children also heard objects being thrown. At some point, the defendant left the apartment and asked another resident to take him to the liquor store. During this trip, the defendant remarked that he and Toni Banks were having problems. When they returned to the apartment complex, the defendant commented that he was going to "straighten things up" with Toni Banks. Thirty to 45 minutes later, the defendant emerged from the apartment and obtained a ride to Crump Street. The defendant remarked that he had done something and was going to leave town.

The following morning, the body of Toni Banks was discovered in her bedroom with a single gunshot to her head. The autopsy revealed that the gun was fired less than six inches from the victim's head. The victim was only partially dressed. The medical examiner explained that the presence of unburned flakes of gunpowder on the inside of the victim's right arm indicated that the victim's arm was above her head at the time the gun was fired, supporting the theory that the victim was asleep at the time of the shooting or that the victim was trying to defend herself. The apartment had been locked from the outside and only Toni Banks and the defendant had the keys. The defendant made his way to the State of Colorado, where he proceeded to commit additional crimes. It was only at the time of his arrest in Colorado that Shelby County authorities learned of his location.

The defendant was previously convicted of reckless endangerment in Shelby County. This conviction arose from the shooting of a Memphis store owner. The defendant also has numerous felony convictions in Colorado. In September 2002, the defendant entered guilty pleas to two counts of first degree murder, two counts of committing a violent crime with a deadly weapon, and three counts of aggravated robbery. In November 2002, the defendant entered guilty pleas to one count of first degree kidnapping, two counts of second degree kidnapping, one count

of aggravated robbery, and one count of menacing with a deadly weapon. Thus, the evidence supporting the application of the (i)(2) aggravating circumstance is overwhelming.

The defendant was 33 years old at the time of the offense. The family of the defendant described him as a decent person, despite his extensive history of criminal convictions. The defendant has three children (ages 12, 17, and 19). The defendant's sister testified that their mother would be greatly affected should the defendant receive the death penalty.

While no two capital cases and no two capital defendants are alike, we have reviewed the circumstances of the present case with similar first degree murder cases and conclude that the penalty imposed in the present case is not disproportionate to the penalty imposed in similar cases.

The sentence of death has been upheld in numerous cases in which the victim was the defendant's wife or girlfriend. *See, e.g., State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005) (defendant struck wife in head with iron skillet; (i)(2) aggravating circumstance); *State v. Suttles*, 30 S.W.3d 252 (Tenn. 2000) (defendant stabbed girlfriend in Taco Bell parking lot; (i)(2) and (i)(5) aggravating circumstances); *State v. Keough*, 18 S.W.3d 175 (Tenn. 2000) (defendant stabbed wife after argument in bar and left her to bleed to death in car; (i)(2) aggravator); *State v. Hall*, 8 S.W.3d 593 (Tenn. 1999) (after arguing with wife, defendant beat, strangled, and drowned her; (i)(5) aggravator); *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997) (angry that girlfriend was going to leave him, defendant set fire to her car while she was inside; (i)(5) and (i)(7) (felony murder) aggravators); *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993) (defendant stabbed, shot, and disemboweled wife; (i)(5) and (i)(12) (mass murder) aggravators); *State v. Johnson*, 743 S.W.2d 154 (Tenn. 1987) (defendant suffocated wife with plastic bag; (i)(2) and (i)(5) aggravators); *State v. Miller*, 674 S.W.2d 279 (Tenn. 1984), *on remand*, 771 S.W.2d 401 (Tenn. 1989) (defendant beat girlfriend to death with fists and fire poker and then stabbed her numerous times; death penalty upheld under (i)(5) aggravating circumstance).

The defendant has prior convictions for first degree murder, aggravated robbery, reckless endangerment, kidnapping, crimes committed with a deadly weapon, and other violent crimes. The death sentence has been upheld based on the sole aggravating circumstance of a prior violent felony conviction. *See, e.g., McKinney*, 74 S.W.3d at 291 (prior conviction for aggravated robbery as adult and aggravated assault as juvenile); *State v. Chalmers*, 28 S.W.3d 913 (Tenn. 2000) (prior convictions for attempted especially aggravated robbery and attempted first degree murder); *State v. Keough*, 18 S.W.3d 175, 183 (Tenn. 2000) (prior convictions for assault to commit voluntary manslaughter and manslaughter); *State v. Smith*, 993 S.W.2d 6 (Tenn. 1999) (prior convictions for robbery and first degree murder); *State v. Boyd*, 959 S.W.2d 557 (Tenn. 1998); *Adkins*, 725 S.W.2d at 660 (prior conviction for aggravated assault). The prior violent felony factor is an aggravating circumstance that the courts of this state have described as "more qualitatively persuasive and objectively reliable than others." *McKinney*, 74 S.W.3d at 313; *State v. Howell,* 868 S.W.2d 238, 261 (Tenn. 1993).

-31-

Our review of these cases reveals that the sentence of death imposed upon the defendant is proportionate to the penalty imposed in similar cases. In so concluding, we have considered the entire record and reach the decision that the sentence of death was not imposed arbitrarily, that the evidence supports the finding of the (i)(2) aggravating circumstance, that the evidence supports the jury's finding that the aggravating circumstance outweighs any mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

## X. Conclusion

Having fully reviewed the record and the applicable authorities, we affirm the defendant's conviction of first degree murder. Additionally, in accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion and that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A)-(C) (2003). A comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the sentence of death imposed by the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-32-